No. 15-1252

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

**WILLIAM REMINGTON and MUSAN DURAKOVIC**,
on behalf of themselves and others similarly situated,

PLAINTIFFS-APPELLANTS,

v.

**J.B. HUNT TRANSPORT, INC.**,

DEFENDANT-APPELLEE.

APPEAL FROM JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**PLAINTIFFS-APPELLANTS'
REPLY BRIEF**

Hillary Schwab (C.A.B. 118616)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
hillary@fairworklaw.com

Maura Greene (C.A.B. 8773)
LAW OFFICE OF MAURA GREENE LLC
One International Place, 8th Floor
Boston, MA 02110
(617) 936-1580
maura@mauragreenelaw.com

## <u>TABLE OF CONTENTS</u>

SUMMARY OF ARGUMENT ...................................................................1

ARGUMENT ..........................................................................................2

I.     THE FAAAA DOES NOT PREEMPT THE MASSACHUSETTS
       INDEPENDENT CONTRACTOR STATUTE. ...............................2

       A.     The FAAAA was not intended to preempt laws
              such as Section 148B.............................................................2

       B.     On this record, in this case, the Court should not have
              held that prong two is preempted. .........................................6

II.    PRONGS ONE AND THREE OF SECTION 148B
       ARE SEVERABLE FROM PRONG TWO. ..................................12

III.   PLAINTIFFS MAY PURSUE THEIR WAGE ACT
       AND COMMON LAW CLAIMS REGARDLESS OF
       WHETHER OR NOT SECTION 148B IS PREEMPTED. ..........18

IV.    THE FEDERAL TRUTH-IN-LEASING REGULATIONS
       DO NOT PREEMPT PLAINTIFFS' CLAIMS. ...........................20

       A.     The Truth-in-Leasing regulations have limited scope and were not
              intended to impact that employment classification of truck drivers...21

       B.     There is no conflict whatsoever between the Truth-in-Leasing
              regulations and Section 148B............................................................22

       C.     The Truth-in-Leasing regulations do not occupy the field of the
              relationship between motor carriers and drivers, and so there is no
              field preemption. ..................................................................26

       D.     The Truth-in-Leasing regulations have no bearing on the FAAAA
              preemption analysis..........................................................................27

CONCLUSION .....................................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................31

CERTIFICATE OF SERVICE ..............................................................32

i

# TABLE OF AUTHORITIES

**Cases**

Alaska Airlines, Inc. v. Brock,
   480 U.S. 678 (1987) ................................................................15

Albillo v. Intermodal Container Serv., Inc.,
   No. LA00754743, 2000 WL 35436363 (Cal. Super. Ct. Sept. 20, 2000)............25

Antilles Cement Corp. v. Fortuno,
   670 F.3d 310 (1st Cir. 2012) ...................................................26

Awuah v. Coverall North America, Inc.,
   460 Mass. 484, 953 N.E.2d 890 (2011)................................................14

Californians for Safe and Competitive Dump Truck Transp. v. Mendonca,
   152 F.3d 1184 (9th Cir. 1998) ................................................25

Commonwealth v. Brown,
   466 Mass. 676, 1 N.E.3d 259 (2013)....................................................17

Commonwealth v. Savage,
   31 Mass. App. Ct. 714, 583 N.E.2d 276 (1991)........................................ 18, 19

Dan's City Used Cars, Inc. v. Pelkey,
   133 S. Ct. 1769 (2013).................................................................5

Depianti v. Jan-Pro Franchising Intern., Inc.,
   465 Mass. 607, 990 N.E.2d 1054 (2013)............................................14

Diatchenko v. Dist. Attorney for Suffolk Dist.,
   466 Mass. 655, 1 N.E.3d 270 (2013)....................................................17

DiFiore v. American Airlines, Inc.,
   646 F.3d 81 (1st Cir. 2011) ................................................9

Empire Fire & Marine Ins. v. Guaranty Nat. Ins. Co.,
   868 F.2d 357 (10th Cir. 1989)...........................................................21

Federal Exp. Corp. v. California Public Utilities Comm'n,
   936 F.2d 1075 (9th Cir. 1991) ........................................................4

Fitzgerald v. Harris,
    549 F.3d 46 (1st Cir. 2008) ...................................................................23

Fulfillment Servs. Inc. v. United Parcel Service, Inc.,
    528 F.3d 614 (9th Cir. 2008) .................................................................25

Good v. Altria Group, Inc.,
    501 F.3d 29 (1st Cir. 2007) ........................................................... 22, 23

Hunter Douglas, Inc. v. Harmonic Design,
    153 F.3d 1318 (Fed. Cir. 1998) .............................................................23

Leavitt v. Jane L.,
    518 U.S. 137 (1996) ..............................................................................16

Lipsitt v. Plaud,
    466 Mass. 240, 994 N.E.2d 777 (2013).................................................20

Lyn-Lea Travel Corp. v. Am. Airlines, Inc.,
    283 F.3d 282 (5th Cir. 2002).................................................................28

Mass. Delivery Ass'n v. Coakley,
    769 F.3d 11 (1st Cir. 2014) .......................................................... 6, 7, 9

Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,
    412 F.3d 215 (1st Cir. 2005) .................................................................22

Murphy v. Commissioner of DIA,
    418 Mass. 165, 635 N.E.2d 1180 (1994)...................................... 16, 17

Nationwide Freight Sys., Inc. v. Illinois Commerce Comm'n,
    784 F.3d 367 (7th Cir. 2015) ................................................................10

New Hampshire Motor Transport Association v. Rowe,
    448 F.3d 66 (1st Cir. 2006) ....................................................................8

Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.,
    192 F.3d 778 (8th Cir. 1999).................................................................27

People ex rel. Harris v. Pac Anchor Transp., Inc.,
    59 Cal. 4th 772 (2014).............................................................................4

Peterson v. Comm'r of Revenue,
    444 Mass. 128, 825 N.E.2d 1029 (2005)............................................................15

Rowe v. New Hampshire Motor Transport Ass'n,
    552 U.S. 364 (2008) ........................................................................................6, 24

Smith v. Comair, Inc.,
    134 F.3d 254 (4th Cir. 1998) .............................................................................25

Somers v. Converged Access, Inc.,
    454 Mass. 582, 911 N.E.2d 739 (2009)............................................................14

Sparkle Hill, Inc. v. Interstate Mat Corp.,
    788 F.3d 25 (1st Cir. 2015) ...............................................................................12

Taylor v. Alabama,
    275 Fed. Appx. 836 (11th Cir. 2008) ................................................................24

**Statutes**

M.G.L. c. 149, § 148B .................................................................................................13

M.G.L. c. 4, § 6 ...........................................................................................................14

**Other Authorities**

An Advisory from the Attorney General's Fair Labor Division
    on M.G.L. c. 149, s. 148B, 2008/1 ............................................................. 14, 19

H.R. Conf. Rep. 103-677, 1994 U.S.C.C.A.N. 1715............................................3, 4

H.R. Conf. Rep. 103-677, 88 .......................................................................................5

H.R. Rep. 103-677, 1994 U.S.C.C.A.N. 1715................................................. 10, 11

H.R. Rep. No. 96-1069, 1980 U.S.C.C.A.N. 2283.................................................2, 3

**Regulations**

49 CFR § 376.1 ...........................................................................................................21

49 CFR § 376.2 ...........................................................................................................21

49 CFR § 376.12 .......................................................................................... 22, 26, 27, 28

## SUMMARY OF ARGUMENT

Congress never intended for the FAAAA to preempt laws such as M.G.L. c. 149, § 148B and/or the Massachusetts wage laws. Instead, Congress was concerned with economic regulation such as the imposition of tariffs, route restrictions, and rate-setting by the states. Moreover, on this record, it cannot be said as a matter of logical inference that J.B. Hunt's prices, routes, or services would be significantly impacted by classifying its drivers in Massachusetts as employees, in light of the fact that it does so as to some of its drivers in Massachusetts already. Nor are the wage laws themselves preempted; J.B. Hunt has presented nothing more than speculation and, at most, a tenuous and remote impact on J.B. Hunt's prices, routes, or services. Section I.

Moreover, even if prong two of Section 148B were preempted, prongs one and three of the statute must remain in effect. Consistent with the strong policy in Massachusetts favoring severability, and in light of the statute's language and history, it is clear that prongs one and three of the statute should still be enforced. Section II. So too with the Massachusetts wage laws—at a minimum, Section 148B is certainly severable from the rest of the Massachusetts wage laws, and the Court may determine employment status through application of the common-law test for determining whether an individual is an employee. Section III.

Finally, the federal Truth-in-Leasing regulations do not preempt Plaintiffs' claims. Those regulations concern certain aspects of the contents of equipment leases in the trucking industry. They expressly disclaim any impact on whether or not a driver is an independent contractor, they do not conflict with Section 148B, and they do not in any way occupy the field of employment classification. Section IV.

## ARGUMENT

## I. THE FAAAA DOES NOT PREEMPT THE MASSACHUSETTS INDEPENDENT CONTRACTOR STATUTE.

### A. The FAAAA was not intended to preempt laws such as Section 148B.

Contrary to J.B. Hunt's argument, the goal of the FAAAA was not to exempt the trucking industry from any and all state regulation. The scope of Congressional intent in enacting the FAAAA is demonstrated by the legislative history, which confirms that Congress did not intend to preempt state laws concerning employment classification and wage payment. First, the stated purpose of the Motor Carrier Act of 1980 (the predecessor to the FAAAA) was "to reduce *unnecessary* regulation by the federal government." H.R. Rep. No. 96-1069, 10, 1980 U.S.C.C.A.N. 2283, 2292 (emphasis added).

Congress deemed this "unnecessary regulation" to include regulation relating to: requirements regarding obtaining certificates from the Interstate

Commerce Commission; "circuitous route restrictions"; and rate setting, *inter alia*.
Id. at 3-5.  None of the rolled-back regulations concerned the employment
relationship between trucking companies and drivers.  Instead, the House Report
specifically included a direction to the Interstate Commerce Commission "to . . .
encourage fair wages and working conditions."  Id. at 11.  As such, it is clear that
the Motor Carrier Act of 1980 reflected Congress' limited concern with
"unnecessary regulation," which did not include regulation relating to employment
classification and/or wages.

 As J.B. Hunt acknowledges, the FAAAA's enactment stemmed from the
same concerns as those driving the enactment of the Motor Carrier Act of 1980.  In
the "Background and statement of purpose" for the FAAAA, Congress explained
that "[t]ypical forms of regulation [that Congress was seeking to preempt as to the
trucking industry with the FAAAA] include entry controls, tariff filing and price
regulation, and types of commodities carried."  H.R. Conf. Rep. 103-677, 86, 1994
U.S.C.C.A.N. 1715, 1758.  There is no mention of anything even approaching the
areas covered by Section 148B or the Massachusetts wage laws.

 Congress was clear about the limitations of preemption, explaining that
"[t]he purpose of this section is to preempt economic regulation by the States, ***not***
to alter, determine or affect in any way . . . whether any carrier is or should be
covered by one labor statute or another."  Id. at 88 (emphasis added).  While that

statement was made in the context of the applicability of the Railway Labor Act and the National Labor Relations Act to the industry, Congress' intent is clear—the FAAAA was intended to preempt "economic regulation," not labor-related regulation.

Contrary to J.B. Hunt's argument, this intent is confirmed by Congress' citation to and disapproval of a California law in the legislative history, which J.B. Hunt describes as "'den[ying] advantageous regulatory exemptions to motor carriers who used a large proportion of independent contractors.'"  Def. Br. at 12 (quoting People ex rel. Harris v. Pac Anchor Transp., Inc., 59 Cal. 4th 772, 787 (2014)).  The "California law" to which the Pac Anchor decision refers is a regulatory scheme by the California Public Utilities Commission which governed "tariffs of common carriers" and "the suspension of the tariffs," as well as regulating "the terms of the bills of lading, the freight bills and 'accessorial services' documents issued by the carriers."  Federal Exp. Corp. v. California Public Utilities Comm'n, 936 F.2d 1075, 1077 (9th Cir. 1991) (cited in H.R. Conf. Rep. 103-677 at 87).  As Congress noted, those regulations sought to "regulate . . . motor carrier operations" and thus raised the concerns Congress sought to remedy in enacting the FAAAA.  H.R. Conf. Rep. 103-677 at 87.

After the Federal Express decision, California created an exemption for some motor carriers from those regulations but then denied the exemption "to

those [motor carriers] using a large proportion of owner-operators instead of company employees." Id.  Congress' concern with those regulations was not its regulation of the independent contractor/employee relationship—the regulations did not seek to regulate the relationship between motor carriers and drivers at all. The issue was that the regulations imposed direct and extensive restrictions on the "operations" of certain motor carriers, including tariffs, bills of lading, etc.  As such, Congress' citation to these California regulations in the legislative history for the FAAAA reconfirms that Congress was concerned with "economic regulation" that directly impacting motor carriers' prices, routes, or services.  H.R. Conf. Rep. 103-677, 88.

J.B. Hunt's complaint that Section 148B creates "a patchwork of state laws," which it claims would defeat Congress' purpose in enacting the FAAAA, once again overstates the scope of Congress' concerns.  Def. Br. at 4.  Congress was ***not*** concerned with a generalized patchwork of laws when it enacted the FAAAA— *i.e.*, the fact that, of course, different states may have some different requirements that would affect the trucking industry.  Congress' concern was limited to "a patchwork of state ***service-determining*** laws. . ." Dan's City Used Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1780 (2013) (emphasis added) (quoting Rowe, 552 U.S. at 373).  In other words, the Supreme Court has further explained, Congress was concerned about "state regulation of the essential details of a motor carrier's

5

system for picking up, sorting, and carrying goods—***essential details of the carriage itself***." <u>Rowe v. New Hampshire Motor Transport Ass'n</u>, 552 U.S. 364, 373 (2008) (emphasis added).  This concern does not extend farther afield to, for example, the employment classification and pay arrangement of those who may be involved in providing the service.  Indeed, as discussed further in Section I.B, <u>infra</u>, such regulations are precisely what is meant by "tenuous, remote or peripheral" impact, which does not trigger FAAAA preemption.  <u>Mass. Delivery Ass'n v. Coakley</u>, 769 F.3d 11, 21 (1st Cir. 2014).

Congress' enactment of the Motor Carrier Act and the FAAAA and the circumscription of the deregulatory purposes therein show that, contrary to  J.B. Hunt's assertion, Congress did not choose "to unfetter [the trucking] industry from most government oversight and interference."  Def. Br. at 6.  Instead, Congress intended there to be deregulation, at both a federal and state level, as to the specifics of the industry's "prices, routes, or services."  <u>Id</u>. at 18.  This simply does not extend to the labor protection laws at issue in this case.

### B.     On this record, in this case, the Court should not have held that prong two is preempted.

J.B. Hunt cannot show that prong two has a significant impact on its prices, routes, or services on this record.  As explained in Plaintiffs' initial brief, the complaint alleges that J.B. Hunt employs both employee and independent

contractor truck drivers.[1]  There is nothing in the record here suggesting that it would have a negative impact on the company to treat all of their drivers as employees—to the contrary, the record indicates that that would only minimally impact the company's operations.  (J.B. Hunt's arguments to this Court as to its rationale for using both employee and independent contractor drivers are not properly considered, see Def. Br. at 18-19, as they are not part of the motion to dismiss record.)  This is in contrast to Xpressman, the "exemplar" company discussed by this Court in Massachusetts Delivery Association v. Coakley, which classified all couriers as independent contractors, not employees.  769 F.3d at 14.

In light of the facts that the complaint alleges employee drivers and that there is no additional record, since the case is before this Court on review of an allowance of a motion to dismiss, J.B. Hunt cannot show preemption.  J.B. Hunt's argument that a factual record is not needed to show preemption misses the mark.  Plaintiffs do not dispute that this Court held in MDA that a significant impact on prices, routes, and services may be demonstrated by looking at the "logical effect" of a particular regulation and that "empirical evidence" may not be needed.  769 F.3d at 21  However, here, the record before the Court demonstrates only that J.B.

---

[1]      In a footnote, J.B. Hunt argues that the Court should not consider this argument because Plaintiffs did not raise it below.  However, Plaintiffs argued extensively below that the District Court could not decide on the record before it that prong two of section 148B is preempted.  See Dist. Ct. Docket No. 9, at 11-14. As such, this argument should be considered by this Court as well.

Hunt would have to transition its independent-contractor drivers to becoming

employees, a process that (on this record) should logically have minimal impact,

since it already employs employee drivers performing the exact same work in

Massachusetts.  Moreover, while this Court did hold that a motor carrier may not

need to present "empirical evidence" to demonstrate a significant impact on prices,

routes, or services, that does not equate to a ruling that no evidence is needed or

that preemption can be found despite the fact that (as here) the only evidence in the

record would point to a lack of significant impact.

The "empirical evidence" which this Court held in New Hampshire Motor

Transport Association v. Rowe, 448 F.3d 66, 82 n.14 (1st Cir. 2006) (and restated

in MDA) may not be necessary referred to, for example, "studies . . . on the cost of

compliance."  Id.  No such evidence was required in Rowe, because one

challenged provision "expressly reference[d] a carrier's service" by requiring

tobacco shippers to use only those carriers that followed prescribed methods of

delivery to tobacco purchasers, 448 F.3d at 79; and, as to the other challenged

provision, "UPS' experience demonstrate[d]" that the provision "has the effect of

forcing UPS to change its uniform package-processing procedures," thus

preventing "timely package delivery" to customers.  Id. at 81.  The statement in

Rowe that cost studies are not required where the effect on services is either

obvious from the statute's express language or has been proven did not amount to a

holding that no evidence would ever be necessary in any case raising FAAAA

preemption, even where the pleadings demonstrated the absence of significant

impact.[2]

Nor is J.B. Hunt's argument about what would happen if it had to comply

with the wage laws—that A would lead to B would lead to C (increased prices)—a

basis for finding preemption of the wage laws trigged by Section 148B, let alone

Section 148B itself.  This is *precisely* the sort of tenuous, remote impact that

cannot be a basis for FAAAA preemption.  The standard as to whether a state law

is preempted is "a ***significant*** impact on[] carriers' prices, routes, or services."

MDA, 769 F.3d at 17-18 (emphasis added).  This Court has been clear that this

does not include every collateral effect that may result from application of a state

law.  In DiFiore v. American Airlines, Inc., this Court stated:  "countless state laws

have *some* relation to the operations of airlines [and trucking companies] and thus

*some* potential effect on the prices charged or services provided," but not all such

laws are preempted.  646 F.3d 81, 86 (1st Cir. 2011).  Similarly, the Seventh Circuit

has recently held that "[t]he Supreme Court's preemption precedents are clear that

---

[2]     Plaintiffs recognize that this Court held in Overka v. American Airlines, Inc.
that the FAAAA (or ADA) preemption analysis may not require an evidentiary
record.  790 F.3d 36, 40 (1st Cir. 2015).  This case is distinguishable though,
because the allegations in the complaint, which must be deemed true on
Defendant's motion to dismiss, are relevant to the preemption analysis and indicate
that preemption should not be found.

not any relationship between state law and carrier rates, routes, and services, no matter how insignificant, will necessarily result in preemption." Nationwide Freight Sys., Inc. v. Illinois Commerce Comm'n, 784 F.3d 367, 375 (7th Cir. 2015). Instead, "the challenged statute or regulatory action must have a meaningful impact in order to be preempted." Id.

Congress itself contemplated the limits of preemption in enacting the FAAAA, explaining that the FAAAA exempted from preemption analysis "State authority to regulate safety, financial responsibility relating to insurance, transportation of household goods, vehicle size and weight and hazardous materials routing . . . , *since State regulation in those areas is not a price, route or service* and thus is unaffected." H.R. Rep. 103-677, 83, 1994 U.S.C.C.A.N. 1715, 1755 (emphasis added). Congress explained that this list of areas of state regulations that do not affect a price, route or service "is not intended to be all inclusive, but merely to specify some of the matters which are not 'prices, [routes] or services' and which are therefore not preempted." Id.

This list in the legislative history of the FAAAA gives some idea of the parameters of what constitutes a tenuous, remote, or peripheral impact. Trucking companies could argue as to virtually all of the listed areas of regulation that compliance with such regulations would increase costs for the companies which would in turn cause an increase in prices. They could argue, for example, that state

10

regulations on "vehicle size and weight" and on "hazardous materials routing" could have an impact on routes.  Id.  They could argue that regulations regarding "financial responsibility relating to insurance" could impact prices.  Id.  But Congress has already determined that any such effects cannot constitute regulation "relating to prices, routes, or services" for preemption purposes, because the connection is simply too tenuous.  So too with J.B. Hunt's arguments about the potential consequences of abiding by the Massachusetts wage laws.  J.B. Hunt has shown nothing more than a speculative remote, tenuous, and/or peripheral impact that the Massachusetts wage laws may have on its prices, routes, or services, which cannot suffice for the claims in this case to be preempted.

The central question for FAAAA preemption purposes is whether or not the company can demonstrate a significant impact on prices, routes, or services.  Even if it were possible to establish preemption by demonstrating that a company's "business model" would be banned by application of Section 148B (a point Plaintiffs dispute, since the FAAAA neither uses nor alludes to such a standard), J.B. Hunt cannot rely on that argument, because the record here shows that its "business model" does include employee drivers.  There is no indication that it would *significantly impact* the company's prices, routes, or services to classify all drivers in that manner.  As such, J.B. Hunt cannot show preemption of prong two of Section 148B or the wage laws it triggers.

11

## II. PRONGS ONE AND THREE OF SECTION 148B ARE SEVERABLE FROM PRONG TWO.

As to prongs one and three, moreover, there is unquestionably no significant impact on J.B. Hunt's prices, routes, or services. A trucking company may operate with independent contractors or employees under those prongs. If it wants to use independent contractor drivers, it must simply comply with prongs one and three of the statute. Even J.B. Hunt limits its argument regarding the preemption of Section 148B to prong two, explaining that "Section 148B is FAAAA-preempted because of the adverse effects that ***Prong Two, and its ban on independent contractors***, would have on motor carriers." Def. Br. at 21 (emphasis added).

As Plaintiffs argued in their initial brief, the District Court erred in considering the severability argument, which was raised for the first time in J.B. Hunt's reply brief. "Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief." Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015). This principle should apply with equal force at the District Court level and is a basis in and of itself for reversal of the District Court's decision.

On the merits as well, prongs one and three should survive, even if the Court holds that prong two is preempted. J.B. Hunt's sole argument that the entire statute should be preempted is that prong two cannot be severed from prongs one and three. J.B. Hunt argues that the statute is not severable because "the court is

unable to know whether the Legislature would have enacted" Section 148B

without prong two.  Def. Br. at 21-22.  However, the entire basis for J.B. Hunt's

argument that the Court cannot know whether the Legislature intended for prongs

one and three to apply without prong two is misplaced.  It argues that the

Legislature never intended Section 148B to apply to motor carriers at all and that

the statute was only meant to apply to the construction industry.

J.B. Hunt's argument is flatly incorrect.  Though the voluminous bill, a

small section of which contained the 2004 amendment to Section 148B, was

entitled "An Act further regulating public construction in the commonwealth," St.

2004, c. 193, the 2004 version of Section 148B itself was enacted without any

qualifier limiting its application to the construction industry.  Instead, Section

148B is entitled "Persons performing service not authorized under this chapter

deemed employees," and the statute applies to "an individual performing *any*

*service*."  M.G.L. c. 149, § 148B(a) (emphasis added).  Pursuant to a plain

language interpretation, "any service" means "any service"; the Legislature

unquestionably intended the statute to apply broadly to all industries.

The agency charged with enforcing Section 148B and the wage laws, the

Attorney General, has confirmed that, though "[t]he 2004 amendment was part of

legislation making broad change to the laws governing the public construction

industry[,] . . . the Law, including the 2004 amendment, applies more broadly to a

wide range of industries."  An Advisory from the Attorney General's Fair Labor

Division on M.G.L. c. 149, s. 148B, 2008/1, at 2.[3]  This is consistent with the

application of Section 148B by the Supreme Judicial Court and other courts to a

variety of industries since the 2004 amendment.  See, e.g., Depianti v. Jan-Pro

Franchising Intern., Inc., 465 Mass. 607, 990 N.E.2d 1054 (2013) (discussing

application of Section 148B in cleaning franchise industry); Awuah v. Coverall

North America, Inc., 460 Mass. 484, 953 N.E.2d 890 (2011) (same); Somers v.

Converged Access, Inc., 454 Mass. 582, 911 N.E.2d 739 (2009) (discussing

application of Section 148B in computer software industry).

　　　　J.B. Hunt also claims that the fact that Section 148B does not contain its

own severability provision "further cloud[s]" the issue of whether it was intended

to be severable.  Def. Br. 23.  That is simply not the case—the Legislature has

pronounced its intent that statutes should be severable in the usual course by

enacting a generally applicable statute to that effect, stating that "[t]he provisions

of any statute shall be deemed severable. . . ."  M.G.L. c. 4, § 6(11) (emphasis

added).  The Legislature need not further reiterate this purpose in every statute it

enacts, in light of this clearly articulated policy.  The SJC has confirmed this point,

---

[3]　　　Particularly in light of this clear pronouncement by the Attorney General's office, J.B. Hunt's citation to a Massachusetts Lawyers Weekly opinion piece arguing that the 2004 amendment to the statute had unintended consequences (and citing but not quoting a statement purportedly from "the office of Sen. Dianne Wilkerson") is not persuasive.

holding that "the absence of a specific severability provision" in a challenged

statute "is of no consequence to our analysis," because "even without an express

severability clause in the [challenged] enactment itself, there is a well-established

judicial preference in favor of severability, as well as the Legislature's codification

of that same general preference, which we must respect." Peterson v. Comm'r of

Revenue, 444 Mass. 128, 139, 825 N.E.2d 1029, 1038 (2005) (internal quotations

omitted), citing Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987) (absence

of severability clause "does not raise a presumption against severability.").

J.B. Hunt's last-ditch effort to argue against severability is its claim that the

statute is too "grammatically and substantively 'entwined'" to be severed.  Def. Br.

at 24.  J.B. Hunt argues that Plaintiffs have not cited cases in which similar "multi-

factor, conjunctive" statutes such as Section 148B have been severed.  Id. at 25.

J.B. Hunt's argument is in error for several reasons.  First, Section 148B is not

"grammatically and substantively 'entwined.'"  The three prongs of the test are

separate, set off from one another by numbers, semicolons, and the word "and."

The removal of prong two would result in a seamless transition to a two-pronged

test.

Second, contrary to J.B. Hunt's argument, Plaintiffs have cited a case in

which the United States Supreme Court clarified that one prong in a multi-pronged

statute could be severed, explaining:  "The relevant question . . . is not whether the

legislature would prefer (A+B) to B, because by reason of the invalidation of A that choice is no longer available. The relevant question is whether the legislature would prefer not to have B if it could not have A as well." <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 143-44 (1996).  While J.B. Hunt makes much of the fact that the Attorney General has stated that "'no prong [of the statute] should be read so broadly as to render the other factors of the test superfluous,'" J.B. Hunt Br. at 24 (citing Attorney General Advisory 2008/1 at 6), this statement suggests nothing more than that the Legislature enacted the statute with the intent of it being effective.  However, as in <u>Leavitt</u>, because "that choice [of all three prongs being enforced] is no longer available," the "relevant question is whether the legislature would prefer not to have [prongs one and three] if it could not have [prong two] as well."  518 U.S. at 143-44.

Third, courts in Massachusetts have severed provisions in statutes far more entwined than prong two.  For example, in <u>Murphy v. Commissioner of DIA</u>, 418 Mass. 165, 635 N.E.2d 1180 (1994), the SJC affirmed the trial court's decision to sever two phrases from a sentence of a statute.  The SJC explained that "there is not, nor should there be, any general rule that only entire sentences may be separated from otherwise valid statutes.  In appropriate circumstances, individual words may be struck."  418 Mass. at 170, 635 N.E.2d at 1183.  Because "the [invalid] words are capable of separation because the new sentence, created by

16

striking out those words, stands as a logical and grammatical sentence," the SJC affirmed the trial court's order "deleting the words 'represented by counsel' and 'equal to the average weekly wage in the commonwealth at the time of the appeal'" from the challenged statute.  418 Mass. at 169, 171, 635 N.E.2d at 1183, 1184.  Similarly, in Commonwealth v. Brown, the SJC held that "the first half of the fourth sentence of [the challenged] statutory provision" was severable.  466 Mass. 676, 688, 1 N.E.3d 259, 268 (2013); see also Diatchenko v. Dist. Attorney for Suffolk Dist., 466 Mass. 655, 667, 1 N.E.3d 270, 282 (2013) ("T]he language in the fourth sentence of G.L. c. 265, § 2, which sets forth the exception to parole eligibility, is invalid as applied to juvenile homicide offenders.").  Here, far more so than in those cases, "the new sentence, created by striking out [prong two], stands as a logical and grammatical sentence," Murphy, 418 Mass. at 169, 635 N.E.2d at 1183, and the statute should be severed.

The strong language of M.G.L. c. 4, § 6(11) and prior judicial precedent regarding the severability of invalid portions of statutes confirm that the Legislature would have intended that the remaining two prongs of Section 148B survive in the event that prong two is found to be unenforceable.

17

### III. PLAINTIFFS MAY PURSUE THEIR WAGE ACT AND COMMON LAW CLAIMS REGARDLESS OF WHETHER OR NOT SECTION 148B IS PREEMPTED.

J.B. Hunt also argues in a perfunctory fashion that Plaintiffs' wage claims cannot survive if Section 148B is held to be preempted.  Citing no authority, J.B. Hunt argues that "if a person cannot meet the definition of 'employee' under Section 148B . . . that person cannot state a claim under the Wage Act."  Def. Br. at 20.  In fact, however, the protections of the Massachusetts wage laws existed long before Section 148B was enacted.  The Wage Act, M.G.L. c. 149, § 148, was first enacted in 1932, as was M.G.L. c. 149, § 150, the enforcement mechanism for the statute.  St. 1932 c. 101, §§ 1, 2.  The statute has existed in essentially its current form in 1936.  See Commonwealth v. Savage, 31 Mass. App. Ct. 714, 716, 583 N.E.2d 276, 278 (1991).  Section 148B was first enacted more than fifty years later, in 1990, and has existed in its present form (with the version of prong two challenged by J.B. Hunt) since 2004.  St. 1990, c. 464; St. 2004, c. 193, § 26.

However, prior to 1990, individuals could and did seek to apply the wage laws to purported independent contractor relationships.  As the Attorney General has explained, "[t]he proper classification of employees has long been an issue of great concern in the Commonwealth."  Prior to the enactment of Section 148B, therefore, "[u]nder common law, a number of factors determined the existence of an employer/employee relationship based on the totality of the relationship . . .

includ[ing] degree of control, the opportunity for profit and risk of loss, the

employee's investment in the business facility, the permanency of the relationship,

the skill required and the degree to which the employee's services were integral to

the business."  Attorney General Advisory 2008/1, at 1; see also Savage, 31 Mass.

App. Ct. at 717, 583 N.E.2d at 278 (in wage case involving alleged violations

before the enactment of Section 148B in 1990, observing that "[w]hether a person

is an employee or an independent contractor involves, in the first instance, an

inquiry into the right of the supposed employer to control the work activities of the

employee").  Though the enactment of Section 148B "established that

notwithstanding that a working relationship could be considered to be one of

independent contractor under common law, the worker may still be deemed in

employment for the purposes of [Section 148B]," Attorney General Advisory

2008/1, at 1, there is no indication that the Legislature would have intended the

wage laws not to apply at all if Section 148B were inapplicable.

     In essence, this is a question of severability—can Section 148B be severed

from the other provisions of the wage laws or does the invalidation of Section

148B render the entire statutory scheme inapplicable?  Applying the severability

analysis described in more detail in Plaintiffs' initial brief, Section I, and in Section

II, supra, there can be no question that Section 148B is severable from the

remaining provisions of the Massachusetts wage laws.  Section 148B stands alone,

is neither grammatically nor substantively entwined with the remaining provisions of the wage laws, and was enacted later than the wage laws at issue in this case. Accordingly, for all of the same reasons set forth as to the severability of prong two, Section 148B can and should be severed from the other wage laws if the Court holds Section 148B to be preempted, leaving Plaintiffs free to pursue their wage claim if they can satisfy the common law definition of "employee."

For similar reasons, Plaintiffs' unjust enrichment claim should survive. As explained above, Plaintiffs need not rely on Section 148B to prove employment misclassification nor the benefits J.B. Hunt derived from it. Indeed, as the SJC has held, "the right of an employee to sue for breach of contract or on a quasi-contract theory arising from the nonpayment of wages is so long standing and fundamental that it requires no citation." Lipsitt v. Plaud, 466 Mass. 240, 247-48, 994 N.E.2d 777, 785 (2013).

Because these claims are independent and not even arguably preempted by the FAAAA, the District Court erred in dismissing Plaintiffs' wage law and common law claims.

## IV.   THE FEDERAL TRUTH-IN-LEASING REGULATIONS DO NOT PREEMPT PLAINTIFFS' CLAIMS.

Perhaps recognizing that the FAAAA does not preempt Plaintiffs' claims, J.B. Hunt has tried another tack as well—arguing that the existence of federal regulations relating to the leasing of trucks (the Truth-in-Leasing regulations)

20

somehow preempts Plaintiffs' claims relating to the employment classification and wage payment arrangement for J.B. Hunt's truck drivers. This argument is a stretch at best. The regulations that J.B. Hunt cites do not occupy the field of the relationship between motor carriers and truck drivers, nor do they conflict in any way with Plaintiffs' claims here. As such, J.B. Hunt's preemption argument must fail.

### A. The Truth-in-Leasing regulations have limited scope and were not intended to impact that employment classification of truck drivers.

As J.B. Hunt acknowledges, the goal of the Truth-in-Leasing regulations was "'to insure that motor carriers would be fully responsible for the operation of vehicles certified to them.'" Def. Br. at 29 (quoting Empire Fire & Marine Ins. v. Guaranty Nat. Ins. Co., 868 F.2d 357, 362 (10th Cir. 1989)). The regulations have a limited scope—they apply only to the leasing and interchange of equipment (specifically motor vehicles and trailers) by motor carriers. See 49 CFR §§ 376.1, 376.2. The regulations require that there be a written lease covering certain specified subjects, receipts for equipment, and identification and records of the equipment. See 49 CFR § 376.1, *et seq*.

The Truth-in-Leasing regulations do not impact any aspect of the motor carrier-driver relationship other than these few provisions relating to the lease of equipment. They do not govern how work is assigned or how drivers are

21

compensated. They do not govern the employment classification of drivers. Indeed, if there is not a lease of equipment between the driver and the motor carrier, the regulations do not apply at all. Significantly, this legislative intent is explicitly confirmed in the regulations themselves, which provide: "Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." 49 CFR § 376.12(c)(4). In other words, the regulations disclaim any intent to govern or impact the employment classification of truck drivers and instead, by implication, leave that issue to the states.

The scope and language of the Truth-in-Leasing regulations demonstrate that they were never intended to have any impact on (much less preempt) drivers' claims relating to employment classification and/or wage payment issues.

### B. There is no conflict whatsoever between the Truth-in-Leasing regulations and Section 148B.

Under the theory of "conflict preemption," "state law is . . . pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Good v. Altria Group, Inc., 501 F.3d 29, 47 (1st Cir. 2007). However, if the state claims at issue are "based on conduct that is not 'protected or governed

22

by the federal . . . law,' then 'the remedy is not preempted.'" Massachusetts Eye &

Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 (1st Cir. 2005)

(quoting Hunter Douglas, Inc. v. Harmonic Design, 153 F.3d 1318, 1335 (Fed. Cir.

1998)).  Moreover, as this Court has observed, "[c]onflict preemption is

particularly difficult to show when 'the most that can be said about the state law is

that the direction in which state law pushes [behavior] is in general tension with

broad or abstract goals that may be attributed to . . . federal laws.'" Fitzgerald v.

Harris, 549 F.3d 46, 52-53 (1st Cir. 2008) (quoting L.H. Tribe, *American

Constitutional Law* § 6-26, at 487 (2d ed.1988)).

Here, the conflict preemption standard is not met.  The Truth-in-Leasing

regulations contain certain requirements for the information contained in the

vehicle leases between motor carriers and drivers.  They do no more than that.

Section 148B and the Massachusetts wage laws concern employment classification

and wage requirements for employees in Massachusetts.  There is simply no

overlap—and therefore no conflict—between the two areas of regulation.

Compliance with both the Truth-in-Leasing regulations and the state statutes at

issue here is not "impossible," and Plaintiffs' claims here in no way act as an

"obstacle to the accomplishment and execution of the full purposes and objectives

of" the purpose of the Truth-in-Leasing regulations.  Good, 501 F.3d at 47.

(Indeed, it cannot even be said that Section 148B "is in general tension with" the

Truth-in-Leasing regulations, which itself would not be enough to find conflict preemption.  Fitzgerald, 549 F.3d at 52-53.)

J.B. Hunt's sole argument for conflict preemption is that application of Section 148B in this case "would eviscerate the owner-operator model," which would in turn render the Truth-in-Leasing regulations "vestigial and purposeless" in Massachusetts.  Def Br. at 31, 32.  But it is false that the Truth-in-Leasing regulations would no longer apply in Massachusetts.  *Inter alia*, they would still govern any situation in which a motor carrier is involved in an equipment lease with another entity.

In arguing for conflict preemption, J.B. Hunt also returns to its argument that the claims here "conflict" with Congress' goal of avoiding a "'patchwork of intrastate trucking laws.'"  Def. Br. at 32 (quoting Taylor v. Alabama, 275 Fed. Appx. 836, 840 (11th Cir. 2008)).  As discussed in Section I.A, supra, Congress was not concerned with any potential patchwork that may result in different states having slightly different requirements that may impact the trucking industry.  Congress' concern was specific—it related to the potential for state-by-state variation in "service-determining laws" such as "state regulation of the essential details of a motor carrier's system for picking up, sorting, and carrying goods— essential details of the carriage itself."  Rowe, 552 U.S. at 373.  As the cases cited by J.B. Hunt explain, the issue was "intrastate ***trucking*** laws," Taylor, 275 Fed.

Appx. At 840, and "shipping regulations," <u>Fulfillment Servs. Inc. v. United Parcel Service, Inc.</u>, 528 F.3d 614, 616 (9th Cir. 2008), ***not*** any and all state laws (including employment laws) that might impact the trucking industry.

J.B. Hunt argues that allowing Plaintiffs' claims to go forward "'would allow the fifty states to regulate an area of unique federal concern.'"  Def. Br. at 33 (quoting <u>Smith v. Comair, Inc.</u>, 134 F.3d 254, 258 (4th Cir. 1998)).  Wages are not an area of unique federal concern though.  (This is in contrast to the claims at issue in <u>Smith</u>, the case cited by J.B. Hunt, where the claims concerned "airlines' boarding practices," which actually is an area of unique federal concern.)  To the contrary, courts have long recognized wages to be an "area of traditional state power."  <u>Californians for Safe and Competitive Dump Truck Transp. v. Mendonca</u>, 152 F.3d 1184, 1188 (9th Cir. 1998).

The fact is that the Truth-in-Leasing regulations and the Massachusetts employment classification and wage laws concern entirely separate regulatory fields.  As one court has noted, "it is clear that whether or not the truck driver lessor is an employee or an independent contractor is determined by state law and not the 'Truth in Leasing Regulations.'"  <u>Albillo v. Intermodal Container Serv., Inc.</u>, No. LA00754743, 2000 WL 35436363, at *9 (Cal. Super. Ct. Sept. 20, 2000) <u>aff'd in part, rev'd in part on other grounds</u>, 114 Cal. App. 4th 190, 8 Cal. Rptr. 3d 350 (2003).  There is no conflict.

**C.     The Truth-in-Leasing regulations do not occupy the field of the relationship between motor carriers and drivers, and so there is no field preemption.**

Field preemption applies when Congress has enacted "a scheme of regulation 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 323 (1st Cir. 2012) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

With no explanation whatsoever, J.B. Hunt asserts that "the field of owner-operator compensation is completely occupied" by the Truth-in-Leasing regulations.  Def. Br. at 33.  Not so – these regulations include a few requirements for the information that goes in an equipment lease, but that is all that they do. They do not concern the pay rates for truck drivers.  They do not even authorize or otherwise approve the amounts paid or charged by motor carriers for compensation, responsibility for tolls, fees, charge-back items, insurance, etc. within equipment leases.  See 49 CFR § 376.12.  ***All they say*** is that the information about those charges must be "specified" in the written equipment lease.  Id.  As such, not only do these regulations not completely occupy "the field of owner-operator compensation," Def. Br. at 33, they hardly even touch on this field (and, in fact, expressly state that they are not "intended to affect whether the

lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee," 49 CFR § 376.12(c)(4)).

J.B. Hunt argues that the existence of a private right of action for violations of the Truth-in-Leasing regulations demonstrates field preemption.  To the contrary, a review of the cases in which this private right of action has been exercised demonstrates the narrow scope of claims under the regulations.  For example, in Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., the plaintiffs alleged that provisions in the company's lease agreements and equipment rental-purchase contracts violated the regulations.  192 F.3d 778, 780 (8th Cir. 1999).  These claims (and others suing for violations of the regulations) do not concern "the field of owner-operator compensation," Def. Br. at 33, they concern the omission of required terms from equipment leases—which is all that the Truth-in-Leasing regulations were intended to cover.

### D.     The Truth-in-Leasing regulations have no bearing on the FAAAA preemption analysis.

J.B. Hunt also tries to argue that the Truth-in-Leasing regulations somehow bear on the FAAAA preemption analysis.  Its argument is in error for several reasons.  First, J.B. Hunt asserts that the Truth-in-Leasing regulations "explicitly approve the use of independent contractors."  Def. Br. at 13.  In fact, what these regulations state is that "[n]othing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or drivers provided by the

lessor is an independent contractor or an employee of the authorized carrier lessee."  49 CFR § 376.12(c)(4).[4]  In other words, the regulations explicate that they have no bearing on employment classification whatsoever.  This further confirms that the regulations do not preempt the claims in this case.

In any event though, J.B. Hunt is incorrect that these regulations have any bearing on the FAAAA preemption analysis.  J.B. Hunt argues that the existence of these regulations "'provide[s] additional support for the conclusion that the [FAAAA] preempts [Appellants'] claims.'"  Def. Br. at 13 (quoting Lyn-Lea Travel Corp. v. Am. Airlines, Inc., 283 F.3d 282, 288 (5th Cir. 2002)).  However, Lyn-Lea concerned the ADA, not the FAAAA, and the "federal regulations" at issue concerned a subject that Congress had "specifically discusse[d]" in the legislative history for the ADA, demonstrating that it was an area of preemption concern.  Id., 283 F.3d at 289.  The Truth-in-Leasing regulations do not hold any similar place in the history of the FAAAA.  Accordingly, even if the Truth-in-Leasing regulations did "approve" the use of independent contractors (which they do not), that would not affect the FAAAA preemption analysis.

---

[4]     J.B. Hunt cites the next sentence in the regulation, which provides that "[a]n independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements."  49 CFR § 376.12(c)(4).  In light of the fact that this sentence immediately follows the sentence stating that the regulations are not intended to affect employment classification, this cannot be read as any sort of imprimatur on the independent contractor relationship.

## **CONCLUSION**

Plaintiffs' claims are not preempted by the FAAAA.  Moreover, prong two of Section 148B is not preempted; if it were, it is severable from the remainder of that statute; and in any event, even if Section 148B were wholly preempted, the wage law claims may be pursued under the common-law employment test. Finally, Plaintiffs' claims are not preempted by the federal Truth-in-Leasing regulations.  Accordingly, for the reasons set forth in Plaintiffs' initial brief and herein, Plaintiffs respectfully request that this Court reverse the District Court's decision.

Respectfully submitted,

WILLIAM REMINGTON AND MUSAN
DURAKOVIC, on behalf of themselves and
others similarly situated,

By their attorneys,


  /s/ Hillary Schwab
Hillary Schwab, BBO No. 666029
C.A.B. 118616
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
Fax:  (617) 488-2261
Email:  hillary@fairworklaw.com

Maura A. Greene, BBO No. 547204
C.A.B. 8773
LAW OFFICE OF MAURA GREENE LLC
One International Place
Boston, MA 02110
(617) 936-1580
Email:  maura@mauragreenelaw.com

Dated:  September 25, 2015

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

     1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,906 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

     2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 with Times New Roman, 14-point type space.


  /s/ Hillary Schwab       
Hillary Schwab

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2015, I electronically filed the foregoing brief with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that counsel for Defendant, at the following address, are registered as ECF filers and that they will be served by the CM/ECF system:

David Casey, Esq.
Stephen T. Melnick, Esq.
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
(617) 378-6000 (t)
(617) 737-0052 (f)
dcasey@littler.com
smelnick@littler.com

 /s/ Hillary Schwab
Hillary Schwab